**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HUMAN RIGHTS DEFENSE CENTER, INC., | No. 24-2552 |
| | D.C. No. 4:21-cv-05047-TOR |
| *Plaintiff - Appellant*, | |
| v. | |
| JEFFERY ALFRED UTTECHT, Superintendent of Coyote Ridge Corrections Center of the Washington Department of Corrections in his individual and official capacities; JOHN D. TURNER, Mailroom Sergeant of Coyote Ridge Corrections Center in his individual and official capacities, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, District Judge, Presiding

Argued and Submitted April 3, 2025
Portland, Oregon

Filed December 11, 2025

Before: Jay S. Bybee and Danielle J. Forrest, Circuit
Judges, and Xavier Rodriguez, District Judge.[*]

Opinion by Judge Forrest

SUMMARY[**]

**Prisoner Mail**

In a 42 U.S.C. § 1983 action brought by Human Rights
Defense Center (HRDC) challenging prison officials'
refusal to deliver and delays in delivering copies of its
publication *The Habeas Citebook* to inmates housed at the
Coyote Ridge Corrections Center, the panel (1) affirmed in
part and reversed in part the district court's summary
judgment in favor of prison officials; (2) reversed the district
court's denial of HRDC's motion for a permanent
injunction; and (3) remanded.

In 2018, the Washington State Department of
Corrections (DOC) revised its prisoner-mail policies to
prohibit inmates from possessing case law documents
(Policy One) or legal materials containing information about
other Washington state inmates (Policy Two). Relying on
those policies, Coyote Ridge officials refused to deliver
copies of *The Habeas Citebook* that were mailed to
inmates.    DOC's    Publication    Review    Committee

---

[*] The Honorable Xavier Rodriguez, United States District Judge for the
Western District of Texas, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has
been prepared by court staff for the convenience of the reader.

overturned Coyote Ridge's decision, but HRDC was not informed of that reversal.  And after the Publication Review Committee's decision, the Coyote Ridge mailroom delayed delivery of *The Habeas Citebook* to inmates.

The panel affirmed the district court's summary judgment for prison officials on HRDC's request for damages on its claim that the two DOC policies limiting prisoners' possession of legal materials received by mail violate the First Amendment.  The panel held that defendants were entitled to qualified immunity because no precedent clearly establishes that the challenged DOC policies were unconstitutional.

However, the panel reversed the district court's denial of HRDC's motion for injunctive relief seeking to prevent enforcement of Policy Two on the grounds that it violated the First Amendment both facially and as applied.  The panel held that the district court erred by not requiring defendants to prove that the challenged DOC policies advanced the asserted penological interests in protecting inmates from harm caused by other inmates, and remanded for the district court to correctly assess the merits of HRDC's claims and the other factors that govern the appropriateness of injunctive relief.

The panel reversed the district court's summary judgment for prison officials on HRDC's claim that prison officials violated the First Amendment by delaying delivery of the *The Habeas Citebook*.  Defendants were not entitled to qualified immunity because HRDC's asserted right against delayed delivery in this context was clearly established.  After the Publication Review Committee's decision, there was no longer a penological justification for

withholding *The Habeas Citebook* and no "security inspection" was needed.

The panel affirmed the district court's summary judgment for prison officials on HRDC's request for damages on its claim that prison officials violated the Fourteenth Amendment by not providing notice of the Publication Review Committee's decision reversing the mailroom's censorship of *The Habeas Citebook*. Defendants were entitled to qualified immunity because HRDC's due process right to be notified of the Committee's decision was not clearly established.

However, the panel reversed the district court's denial of HRDC's request for a permanent injunction requiring prison officials to give publishers timely notice of the Publication Review Committee's decisions. The panel remanded for the district court to analyze HRDC's motion for injunctive relief by assessing, among other things, whether requiring Coyote Ridge to notify publishers of the Publication Review Committee's decisions would not be unduly burdensome.

**COUNSEL**

Katherine C. Chamberlain (argued), Jesse A. Wing, and Nathaniel Flack, MacDonald Hoague & Bayless, Seattle, Washington; Jonathan P. Picard, Human Rights Defense Center, Lake Worth, Florida; for Plaintiff-Appellant.

Katherine J. Faber (argued) and Sarah C. Brisbin, Assistant Attorneys General, Corrections Division; Robert W. Ferguson, Washington Attorney General; Office of the Washington Attorney General, Olympia, Washington; for Defendants-Appellees.

Melissa R. Lee and Jessica Levin, Ronald A. Peterson Law Clinic, Seattle, Washington; Laurel Jones, Columbia Legal Services, Seattle, Washington; for Amici Curiae Center for Civil Rights and Critical Justice, Fred T. Korematsu Center for Law and Equality, and Columbia Legal Services.

Brent Low, Jazmyn Clark, and La Rond Baker, American Civil Liberties Union of Washington, Seattle, Washington, for Amicus Curiae American Civil Liberties Union of Washington Foundation.

Christopher M. Petroni and Gregory C. Link, Washington Appellate Project, Seattle, Washington, for Amicus Curiae Washington Appellate Project.

# OPINION

FORREST, Circuit Judge:

This case concerns the constitutional protections that apply to prisoner mail. Plaintiff Human Rights Defense Center (HRDC) publishes legal materials for prisoners representing themselves in litigation. One of its publications is *The Habeas Citebook: Ineffective Assistance of Counsel* (*The Habeas Citebook*), which HRDC has sent to thousands of prisoners across the United States. In 2018, the Washington State Department of Corrections (DOC) revised its prisoner-mail policies to prohibit inmates from possessing "case law documents" and any legal materials containing information about other Washington state inmates. Relying on those policies, officials at the Coyote Ridge Corrections Center (Coyote Ridge), located in Connell, Washington, refused to deliver copies of *The Habeas Citebook* that were mailed to inmates housed at that facility. DOC's Publication Review Committee later overturned Coyote Ridge's decision, but HRDC was not informed of that reversal. And even after the Publication Review Committee's decision, the Coyote Ridge mailroom delayed delivery of *The Habeas Citebook* to inmates, in one case for 493 days.

HRDC sued two Coyote Ridge officials, Jeffrey A. Uttecht, the former superintendent, and John D. Turner, the mailroom sergeant. HRDC asserts that Defendants violated the First and Fourteenth Amendments, and it seeks monetary relief under 42 U.S.C. § 1983 and a permanent injunction. In a prior appeal, we reversed the district court's grant of summary judgment for Defendants. Before us now is the district court's second grant of summary judgment for

Defendants and its denial of HRDC's cross-motion for summary judgment and motion for permanent injunctive relief. We affirm in part, reverse in part, and remand. The district court correctly granted summary judgment for Defendants on HRDC's request for damages on its First Amendment claim challenging DOC's prisoner-mail policies and its Fourteenth Amendment claim. But we reverse the district court's grant of summary judgment as to HRDC's request for injunctive relief on these two claims and as to HRDC's requests for both damages and injunctive relief on its First Amendment claim challenging delayed delivery of *The Habeas Citebook* after the Publication Review Committee determined this publication was permissible.

## BACKGROUND

### A.  DOC Policies

DOC adopted the two prisoner-mail policies at issue here in 2018. These policies state:

> [1] Individuals will not possess case law documents, including discovery material, unless approved by the Superintendent/ designee.

> [2] Individuals will not possess legal materials (e.g., case law, legal documents) containing information about another [] Washington State incarcerated individual.

DOC interpreted "case law" to include all "[l]aw that comes from decisions made by judges in previous cases."

DOC adopted these policies to promote inmate safety. It was concerned about "paper checking," which is when inmates demand that one of their peers produce documentation to determine if, for example, that peer is a sex offender or gang member, has "told on another individual," or has accurately reported the things they have done so that other inmates can assess whether they are "a solid individual in the incarcerated's eyes." Defendants assert that an inmate's refusal to produce such documentation upon demand often results in violence.

After DOC adopted the two policies at issue, Defendant Uttecht, who was then Superintendent of Coyote Ridge, issued an Operational Memorandum directing staff to follow DOC's policies.

## B. Coyote Ridge Rejects *The Habeas Citebook*

Between June 2019 and June 2020, HRDC sent *The Habeas Citebook* to at least 18 prisoners incarcerated at Coyote Ridge. This book was published to assist pro se prisoners with habeas litigation, and it contains sample pleadings with party names redacted. The mailroom at Coyote Ridge rejected at least 16 copies of the book between April and July 2020. The mailroom notified HRDC of each rejection, citing both DOC policies and stating that the book "contains case law." The notices explained that "[a]n appeal request is not needed for . . . rejected publications, which are automatically reviewed by the Superintendent/designee or Publication Review Committee."[1] The Publication Review Committee is located at DOC Headquarters, not Coyote Creek.

---

[1] DOC policy states that rejected publications "will be referred to the Publication Review Committee for further review and a final decision."

HRDC wrote to Defendant Turner, Coyote Ridge's mailroom sergeant, stating that censorship of *The Habeas Citebook* violated HRDC's First Amendment right to communicate with Coyote Ridge prisoners, that there was no penological reason this book should be rejected, and that this book had been delivered to thousands of prisoners across the country without incident. Despite the notice's assurance that rejected publications are automatically reviewed, Sgt. Turner initially did not forward *The Habeas Citebook* to the Publication Review Committee for review of Coyote Ridge's rejection decision because he believed the book clearly violated DOC policy. Two months after the first rejection, Sgt. Turner contacted the Publication Review Committee, asking that it uphold the mailroom's decision. But the Committee overturned the mailroom, concluding that the book did "not violate policy."

DOC policy requires that publishers "be notified of the [C]ommittee's decision . . . within 10 business days." Sgt. Turner never notified HRDC of the Committee's reversal decision, and he testified that providing notice to publishers of the Publication Review Committee's decisions is not required. Additionally, after the Publication Review Committee reversed the mailroom's rejection of *The Habeas Citebook*, the mailroom failed to promptly deliver the book to numerous prisoners. The delivery delays ranged from several weeks to over a year, and in one case, the book still had not been delivered 493 days after the Committee's final decision. Several prisoners never received the book before their release from Coyote Ridge.

## C.  DOC Revises Policy

In March 2020, a DOC correctional manager indicated that the policies restricting prisoners' incoming mail containing legal materials were being revised. She stated:

> During the . . . revision, we may lift the ban on restriction of all case law, and go back to the rule that they cannot have case law with information about other Washington State DOC offenders. There is really no penological reason that they cannot have case law that may possibly pertain to their case, with the exception noted here.

Several months later, in November 2020, Policy One was rescinded. Policy Two remains in effect. While Policy Two prohibits Washington prisoners from receiving legal materials by mail that contain information about other individuals currently incarcerated in Washington, prisoners can access this same information through other sources, including LexisNexis, which is available in the prison law library.

## D.  HRDC's Lawsuit

HRDC sued Defendants in their official and individual capacities, alleging that DOC's policies and the delayed delivery of *The Habeas Citebook* after the Publication Review Committee's approval violated the First Amendment and that the Defendants' failure to notify HRDC of the Committee's decision violated the Fourteenth Amendment. In June 2022, the district court granted summary judgment for Defendants, concluding that the constitutional challenge to Policy One was moot because it

was rescinded, the challenge to Policy Two was hypothetical, the delivery delays did not violate the First Amendment because they were temporary, there was no Fourteenth Amendment violation, and Superintendent Uttecht did not personally participate in any of the alleged violations. We largely reversed. *Hum. Rts. Def. Ctr. v. Uttecht* (*HRDC I*), No. 22-35762, 2023 WL 7211396, at *1–3 (9th Cir. Nov. 2, 2023). While HRDC's challenge to Policy One was moot as to injunctive relief, we held that it was not moot as to damages, and that HRDC had standing to challenge Policy Two. *Id.* at *1. We also held that there was a genuine factual dispute concerning whether Coyote Creek delayed delivery of *The Habeas Citebook* after it was found not to violate DOC policy and that the district court misapplied the law in rejecting HRDC's Fourteenth Amendment claim. *Id.* at *2. Finally, we concluded that there was a genuine factual dispute concerning former-Superintendent Uttecht's personal liability. *Id.* at *3.

On remand, the parties cross-moved for summary judgment, and HRDC sought a permanent injunction preventing enforcement of Policy Two and requiring Defendants to provide timely notice of the Publication Review Committee's decisions. The district court again granted summary judgment for Defendants and denied HRDC's motion for an injunction.

The district court first concluded that neither Defendant is personally liable as to Policy One because, among other things, Superintendent Uttecht was not involved in the censorship decisions, HRDC failed to rebut evidence that Sgt. Turner timely put all copies of *The Habeas Citebook* that Coyote Creek had received "in the mailbag for delivery to the intended recipients" after the Publication Review Committee made its decision, and "[i]n any event, the

temporary delay in the delivery of a publication that is a result of the prison's security inspection is not a First Amendment violation." The district court also concluded that HRDC's challenge to Policy Two fails because the policy is justified for penological reasons and granting injunctive relief against the Defendants in this case would be meaningless because Uttecht is no longer superintendent at Coyote Creek and Sgt. Turner is required to follow DOC's and his supervisor's directives.

In addressing HRDC's Fourteenth Amendment challenge and our prior instruction to determine whether requiring the Publication Review Committee to provide publishers notice of its final decisions would be unduly burdensome, the district court asserted that it lacked jurisdiction over the Committee and DOC. It also concluded that failure to provide notice is a due-process violation only if such failure is "pursuant to prison policy," which it was not here.

Finally, the district court concluded that Defendants were protected by qualified immunity from any monetary liability because the two DOC policies were reasonably related to a legitimate penological interest and inmates were provided alternative means for accessing caselaw. Additionally, the district court concluded that no precedent clearly established that either policy was unconstitutional.

HRDC timely appealed, challenging each of the district court's conclusions.

## DISCUSSION

"We review a district court's grant of summary judgment de novo." *Long v. Sugai*, 91 F.4th 1331, 1336 (9th Cir. 2024). "Summary judgment is appropriate if 'there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' The deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party." *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). We address the parties' arguments and the district court's decisions as to each claim.

## A. First Amendment—DOC Policies

HRDC first asserts that the two DOC polices limiting prisoners' possession of legal materials received by mail violate the First Amendment. "Publishers have a First Amendment right to communicate with prisoners by mail, and inmates have a First Amendment right to receive this mail." *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005). But in the prison context, a regulation that impinges on constitutional rights is nonetheless "valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Prison regulations restricting incoming publications are analyzed under the *Turner* factors. *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989). These factors are:

> (1) whether the regulation is rationally related to a legitimate and neutral governmental objective[;]
>
> (2) whether there are alternative avenues that remain open to the inmates to exercise the right[;]
>
> (3) the impact that accommodating the asserted right will have on other guards and prisoners, and on the allocation of prison resources; and

(4) whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials.

*Lehman*, 397 F.3d at 699 (citation omitted). "The *Turner* analysis applies equally to facial and 'as applied' challenges." *Bahrampour v. Lampert*, 356 F.3d 969, 975 (9th Cir. 2004).

In assessing HRDC's challenge to DOC's policies, we address (1) whether Defendants are protected by qualified immunity from monetary liability, and (2) whether HRDC is entitled to an injunction barring enforcement of Policy Two.

## 1.  Qualified Immunity

The district court concluded that even if otherwise liable, both Defendants are protected by qualified immunity from monetary liability. "We review a district court's determination of qualified immunity de novo." *Id.* at 976. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks and citation omitted). We may assess in any order whether there has been a violation and whether the purported violation was clearly established. *Id.* at 236.

a.

At the outset, we reject HRDC's argument that Defendants waived the right to assert qualified immunity by not pleading this defense in their answer. Waiver does not

apply because Defendants raised qualified immunity at summary judgment, and HRDC has not asserted that it was prejudiced by Defendants not raising this issue at the pleading stage. *See Camarillo v. McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993). We also reject HRDC's assertion that we "previously denied qualified immunity *sub silentio*" by reversing and remanding to the district court to address the merits of HRDC's claims. In *HRDC I*, we merely instructed the district court to assess whether Defendants could be individually liable. 2023 WL 7211396, at *2–3. We did not foreclose Defendants from asserting qualified immunity.

b.

In assessing whether Defendants are protected by qualified immunity, we begin with whether the violations that HRDC asserts were clearly established at the time of Defendants' actions. "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (internal quotation marks and citation omitted). The right at issue must be defined with particularity, considering a case's specific context, and not "at a high level of generality." *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (citation omitted). "[T]he question is whether the defendant could . . . have reasonably . . . believed that his or her conduct did not violate the plaintiff's rights." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc).

HRDC argues that the unconstitutionality of DOC's policies is clearly established under *Turner* and *Thornburgh*. These cases hold that a prison official's censorship of prisoner mail is unconstitutional if it is not reasonably

related to a legitimate penological interest. *Turner*, 482 U.S. at 89; *Thornburgh*, 490 U.S. at 413. HRDC contends that no reasonable prison official could have believed that banning *The Habeas Citebook* was lawful because a DOC correctional manager wrote in an email that "[t]here is really no penological reason that [prisoners] cannot have case law."

One DOC official's opinion that no penological interest was served by banning all caselaw does not establish that "*every* reasonable official would understand that [enforcing Policy One] is unlawful." *Wesby*, 583 U.S. at 63 (emphasis added) (internal quotation marks and citation omitted). There is no precedent clearly establishing that the broad caselaw restriction DOC imposed lacked a valid penological justification, nor is there evidence that DOC announced the position stated in the official's email (sent to one person) to its employees broadly. Defendants were bound to follow DOC policies in their roles working at a DOC facility. And whether Policy One served a legitimate penological interest was open to judgment. Defendants could have reasonably, even if erroneously, believed that enforcing Policy One "did not violate the plaintiff's rights." *Devereaux*, 263 F.3d at 1074. Thus, it was not clearly established that Policy One was unconstitutional. And because HRDC makes no argument as to why Policy Two, which restricted a narrower set of legal materials, should be treated differently, neither was it clearly established that Policy Two was unlawful.

HRDC relies on *Lehman*, where we denied qualified immunity to prison officials who censored caselaw sent to prisoners. 397 F.3d at 703–04. There, the plaintiff challenged a DOC policy "prohibit[ing] the delivery of 'mail containing information which, if communicated, could create a risk of violence and/or physical harm to any

person.'" *Id.* at 703. Analyzing that policy, we first noted that "the DOC regulation prohibiting mail that could create a risk of violence and physical harm to any person [wa]s constitutional on its face." *Id.* Thus, the issue related to how the policy was applied. The plaintiff-publisher asserted that prison officials "singled out [the plaintiff] for discriminatory treatment, while allowing other publishers to deliver similar material," and that "the real motive of the prison officials who prevented third-party legal materials from being delivered was to suppress materials that embarrass the DOC and educate inmates on how to file their claims." *Id.* We held that if these allegations were true, the prison officials clearly violated the First Amendment, and we denied summary judgment. *Id.*

Here, HRDC has not alleged that DOC's policies were applied in a discriminatory manner. And, as in *Lehman*, the prisoner-mail restrictions were adopted for security reasons. Thus, based on *Lehman*, Defendants could have reasonably believed that enforcement of the policies was constitutional. *See Devereaux*, 263 F.3d at 1074.

Because HRDC does not point to any precedent clearly establishing that the challenged DOC policies are unconstitutional, Defendants are entitled to qualified immunity as to HRDC's request for damages.[2] *See Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) ("The plaintiff bears the burden of 'point[ing] to prior case law that articulates a constitutional rule specific enough to alert these

---

[2] Because it was not clearly established that the DOC's prisoner-mail policies were unlawful at the time of Defendants' challenged actions, triggering qualified immunity, we do not address whether former-Superintendent Uttecht can be held liable under the supervisor-liability doctrine for implementing the DOC policies at Coyote Ridge.

officers in this case that their particular conduct was unlawful.'" (alteration in original) (citation omitted)).

## 2. Injunctive Relief

HRDC also seeks an injunction preventing enforcement of Policy Two because it violates the First Amendment both facially and as applied. Whether a plaintiff is entitled to permanent injunctive relief depends on the merits of the claim. *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Rels.*, 730 F.3d 1024, 1032 (9th Cir. 2013). The plaintiff must demonstrate that (1) its claim succeeds on the merits, (2) the plaintiff has suffered irreparable injury, (3) the remedies available at law are inadequate, (4) the balance of hardships justifies an equitable remedy, and (5) the public interest would not be disserved by an injunction. *Id.*

### a.

Before addressing the merits of HRDC's claim, we consider the district court's conclusion that injunctive relief is not properly awarded against the named Defendants because former-Superintendent Uttecht no longer works at Coyote Ridge and Sgt. Turner "must follow the directives of his superiors and DOC." Both Superintendent Uttecht and Sgt. Turner were sued in their individual *and official* capacities. "Suits against state officials in their official capacity . . . should be treated as suits against the State. Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation." *Hafer v. Melo*, 502 U.S. 21, 25 (1991) (internal citation omitted). Thus, if injunctive relief is proper, it matters not that Uttecht no longer works at Coyote Ridge—the relief would run against the individual currently serving as Superintendent.

As to whether injunctive relief is proper, "[b]ecause the real party in interest in an official-capacity suit is the government entity and not the named official, 'the entity's "policy or custom" must have played a part in the violation of federal law.'" *Id.* (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). Additionally, "[t]he individual state official sued 'must have some connection with the enforcement of the [challenged state policy].'" *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1134 (9th Cir. 2012) (quoting *Ex parte Young*, 209 U.S. 123, 157 (1908)). The connection between official capacity and enforcement "must be fairly direct; a . . . general supervisory power over the persons responsible for enforcing the challenged" policy is insufficient. *Id.* (quoting *L.A. County Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992)).

There is no question that the policies of the entity that the named officials serve—Coyote Ridge, a DOC facility—played a part in the asserted constitutional violation. And Superintendent Uttecht's and that Sgt. Turner's roles are directly connected to enforcement of the challenged policies. Whatever the extent of Superintendent Uttecht's role in "proceduralizing" the DOC policies at issue, we are satisfied that the Superintendent's responsibility for establishing policy and strategic direction at Coyote Ridge according to DOC directives is enough to permit injunctive relief. *See id.* Likewise, Sgt. Turner has not argued, nor could he, that his role in the mailroom did not include enforcing DOC policy. To the contrary, Sgt. Turner acknowledged that in addition to overseeing the mailroom's day-to-day operations, his responsibilities included reviewing mail-rejection appeals. For these reasons, the district court was incorrect that awarding injunctive relief against the named officials in this case would be inappropriate.

b.

Turning to the merits of HRDC's claim, as explained above, we apply the *Turner* reasonableness factors. We have established two different tests for assessing the first factor— "whether there is a rational connection between the challenged policy and a legitimate governmental interest." *See Mauro v. Arpaio*, 188 F.3d 1054, 1058–60 (9th Cir. 1999) (en banc); *Walker v. Sumner*, 917 F.2d 382, 385–86 (9th Cir. 1990). Under *Mauro*, courts must consider only whether prison officials "might reasonably have thought that the policy would advance [the prison's] interests." 188 F.3d at 1060. Under *Walker*, by contrast, prison officials must do more—they must "identify the specific penological interests involved and then demonstrate both that those specific interests are the actual bases for their policies and that the policies are reasonably related to the furtherance of the identified interests." 917 F.2d at 386.

Which test applies depends on whether the plaintiff has presented evidence refuting that the prison policy is rationally related to a legitimate objective:

> When the inmate presents sufficient (pre or post) trial evidence that refutes a common-sense connection between a legitimate objective and a prison regulation, *Walker* applies, and the state must present enough counter-evidence to show that the connection is not so "remote as to render the policy arbitrary or irrational." On the other hand, when the inmate does not present enough evidence to refute a common-sense connection between a prison regulation and the objective that government's counsel

argues the policy was designed to further, *Mauro* applies and, presuming the governmental objective is legitimate and neutral, *Turner*'s first prong is satisfied.

*Frost v. Symington*, 197 F.3d 348, 357 (9th Cir. 1999) (internal citations omitted).

Here, the district court applied the *Mauro* test and reasoned that the first *Turner* factor was satisfied because "DOC ha[d] expressed its penological reasons for keeping certain documents out of jail cells and only allowing prisoners to access case law in the law library." The district court "[took] judicial notice that the DOC's concerns are real" and did not require Defendants to make any showing that Policy Two actually serves the asserted safety-and-security interest.

HRDC argues that the district court erred by not applying the *Walker* test because HRDC "presented evidence refuting any claimed common-sense connection between the caselaw bans and the purported objective of preventing paper-checking." The evidence that HRDC relies on includes:

- An admission from a DOC correctional manager that "[t]here is really no penological reason that [prisoners] cannot have case law that may possibly pertain to their case, with the exception" of "case law with information about other Washington State DOC offenders";

- That the "[*The Habeas Citebook*] has been delivered to thousands of prisoners

in facilities across the United States without incident";

- Superintendent Uttecht's statement that he is not aware of any specific example of incoming prisoner mail containing caselaw that posed a safety or security threat and does not "understand why they didn't allow some of those items in";

- Sgt. Turner's statement that he does not know why prisoners were barred from receiving all caselaw and has "no idea" why they are allowed to view caselaw in the law library but not to possess that same information;

- Sgt. Turner's statement that he could not recall any circumstances where incoming mail containing caselaw was identified as a safety and security threat and sent to the Intelligence & Investigations Unit for investigation;

- That the DOC does not have data on how frequently paper checking occurs or how often it results in violence, whether the risk is greater when an inmate possesses documentation about another inmate, as opposed to only oral reports, or whether its mail restrictions make any difference to the frequency of paper checking; and

- That the DOC does not take any steps to prevent inmates from learning of other prisoners' crimes through print,

> television, or radio news, and inmates can learn about other prisoners by using Lexis Nexis in the law library.

We recognize that protecting inmates from harm caused by other inmates, including through paper checking, is a legitimate penological interest. *See Prison Legal News v. Ryan*, 39 F.4th 1121, 1132 (9th Cir. 2022) ("We have held that '[i]t is beyond question that both jail security and rehabilitation are legitimate penological interests.'" (alteration in original) (citation omitted)). But we agree that HRDC's evidence casts doubt on whether Policy Two serves this interest because there is no indication of how it (or Policy One) restricts the legal materials that an inmate may possess in a way that reduces the frequency of paper checking or inmate-on-inmate harm more generally. *See Walker v. Gomez*, 370 F.3d 969, 975–77 (9th Cir. 2004) ("Walker's uncontested allegation that black inmates were permitted to use the law library supervised only by a vocational officer calls into question whether the prison's security concerns were really so acute that it was rational to treat blacks as automatically ineligible for critical-worker status.").

Defendants recalled no circumstances where an inmate possessing caselaw posed a security risk, and neither DOC nor Coyote Ridge can demonstrate that banning inmates from possessing legal materials has reduced the incidence of paper checking. That inmates can obtain the same legal materials they are banned from receiving by mail from other permissible sources, including legal databases in the prison law library, also undercuts the proposition that there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify

it." *Turner*, 482 U.S. at 89 (internal quotation marks and citation omitted). Therefore, we conclude that the *Walker* test applies and the district court erred by not requiring Defendants to prove that the challenged DOC policies advanced the asserted penological interest. *See Frost*, 197 F.3d at 357.

The district court observed that the Prison Litigation Reform Act (PLRA) requires courts to give substantial weight to any adverse impact on public safety. *See* 18 U.S.C. § 3626(a)(1)(A). Defendants similarly argue that courts must accord substantial deference to the professional judgment of prison administrators. *See Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976) ("When a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court system, his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs." (citation modified)).

The PLRA does not subjugate constitutional rights to public safety. Rather, it dictates that "[p]rospective relief . . . with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). Here, the district court did not reach this scope consideration because it denied HRDC's motion for an injunction outright after misapplying the law. On this record, we must reverse the district court and remand for it to correctly assess the merits of HRDC's claims and the other factors that govern the appropriateness of injunctive relief.

## B. First Amendment—Delivery Delays

Next, HRDC asserts that Defendants violated the First Amendment by not timely having DOC's Publication

Review Committee review the mailroom's rejection of *The Habeas Citebook* and by not timely delivering the book to inmates after the Committee reversed the mailroom's censorship. Again, the First Amendment "protects the right to receive information and ideas," *Stanley v. Georgia*, 394 U.S. 557, 564 (1969), and this right extends to prisoners "unless it is 'inconsistent with a person's status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Clement v. Cal. Dep't of Corrs.*, 364 F.3d 1148, 1151 (9th Cir. 2004) (quoting *Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 129 (1977)) (citation modified).

### 1.  Qualified Immunity

Sgt. Turner personally participated in the challenged action in his role as the direct supervisor of the mailroom and its staff. But he again argues that he is protected by qualified immunity because the failure to deliver *The Habeas Citebook* after the Publication Review Committee determined that it "d[id] not violate policy" was not a clearly established First Amendment violation. We disagree.

#### a.

Delayed delivery of prisoner mail is constitutionally permissible if it is temporary and "result[s] from the prison official's security inspection." *Crofton v. Roe*, 170 F.3d 957, 961 (9th Cir. 1999). "[R]egulations affecting the sending of a 'publication' . . . to a prisoner must be analyzed under the *Turner* reasonableness standard." *Thornburgh*, 490 U.S. at 413. Necessarily then, delays in delivering publications mailed to prisoners violate the First Amendment if those delays are not reasonably related to legitimate penological interests. *See id.* (holding that regulations governing incoming publications "are 'valid if [they are] reasonably

related to legitimate penological interests'" (alteration in original) (quoting *Turner*, 482 U.S. at 89)).

Here, the Publication Review Committee conclusively established that the prison had no penological justification for withholding *The Habeas Citebook* from inmates, and Coyote Ridge did not assert this justification after the Committee's decision. Nonetheless, the books were not delivered to their intended recipients after the Committee's decision for periods ranging from 14 to 493 days, with most delays lasting well over 100 days. Some copies were never delivered before the intended recipients were released from Coyote Ridge.

With no penological justification for withholding the book after the Publication Review Committee's decision, existing precedent clearly establishes that not delivering the book was unlawful. This is true even though none of our precedent delineates a brightline rule for how much delay is too much. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) ("[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." (citation modified) (quoting *United States v. Lanier*, 520 U.S. 259, 270–71 (1997)); *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000) ("[Q]ualified immunity is inappropriate where the preexisting law was sufficient to provide the defendant with 'fair warning' that his conduct was unlawful." (quoting *Lanier*, 520 U.S. at 270–71)). The principle that inmates retain the right to obtain information to the extent this right does not contravene legitimate penological interests is clearly established. *See Thornburgh*, 490 U.S. at 413. After it becomes clear that no penological justification for withholding information sent to prisoners exists, it would be

absurd to conclude that prison officials could nonetheless continue to withhold the information simply because no case has defined exactly what length of delay is permissible and what length is not. And with most of the delays here lasting over 100 days, this is not a close case.

The linchpin of the analysis is whether the prison has a legitimate penological interest for withholding information sent to an inmate. *Id.*; *Clement*, 364 F.3d at 1151. If no such interest exists, the inmate's First Amendment right to receive the information remains operable and enforceable. *Clement*, 364 F.3d at 1151.

Of course, in some situations, penological interests separate from those that led to the policies challenged here might justify withholding information for a time. For example, if a prison facility were on lockdown when it became clear that there was no penological justification for withholding an inmate's mail, a delivery delay related to the lockdown might not be unlawful. As with other reasonableness standards, courts must consider the totality of the circumstances. *See Lehman*, 397 F.3d at 699 (discussing *Turner* factors). But here, Defendants point to no penological interests separate from concerns about whether *The Habeas Citebook* was permissible under DOC policy. Therefore, when this interest fell away after the Publication Review Committee's decision, "every reasonable official [in this context] would understand that [withholding the subject mail from prisoners] is unlawful." *Wesby*, 583 U.S. at 63 (internal quotation marks and citation omitted).

b.

Because we conclude that HRDC's asserted right against delayed delivery in this context is clearly established, we must consider whether HRDC has demonstrated that there is

a question of fact concerning whether a violation occurred. *Pearson*, 555 U.S. at 236. In *HRDC I*, we rejected the district court's conclusion that the delivery delays were "temporary" under *Crofton* and, therefore, permissible. 2023 WL 7211396, at *2. But we also concluded that there were genuine factual disputes regarding whether Sgt. Turner was responsible for the delivery delays—specifically, whether he placed the books in the mailbag for delivery after the Committee reached its decision, as he testified. *Id.* We remanded for the district court to assess whether the "delivery delays due to the initial content-based rejection were First Amendment violations" and whether "Turner can be individually liable." *Id.*

On remand, the district court again reasoned that the delivery delays were "temporary" and due to "the prison's security inspection." We rejected the district court's factual findings regarding the nature and circumstances of the delay in *HRDC I*, and its return to these findings violated our mandate. *See S.F. Herring Ass'n v. Dep't of Interior*, 946 F.3d 564, 574 (9th Cir. 2019) ("[T]he mandate of an appellate court forecloses the lower court from reconsidering matters determined in the appellate court." (quoting *Nguyen v. United States*, 792 F.2d 1500, 1502 (9th Cir. 1986)). As we have explained, after the Publication Review Committee's decision, there was no longer a penological justification for withholding *The Habeas Citebook* and no "security inspection" was needed. *Crofton*, 170 F.3d at 961.

The district court also concluded that HRDC failed to show that Sgt. Turner was responsible for the delivery delays because he testified that he "placed all books in the mailbag for delivery to the intended recipients," and HRDC's contention otherwise was mere speculation. Again, this was error. Sgt. Turner supervised the mailroom and its personnel.

He testified that he personally placed the previously withheld copies of *The Habeas Citebook* into the mailbag for delivery after the Publication Review Committee made its decision. He also claimed that he did this "[o]n or around" the day after the Committee's decision. Yet the delays in getting the books delivered are undisputed and unexplained. This is sufficient circumstantial evidence to create a question of fact regarding whether Sgt. Turner was responsible for the delivery delays. *See United States v. Kelly*, 527 F.2d 961, 965 (9th Cir. 1976) ("[C]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred.").

For these reasons, we reverse the district court's finding of qualified immunity as it relates to HRDC's First Amendment delayed-delivery claim.

### 2. Injunctive Relief

HRDC does not seek stand-alone injunctive relief on its delayed-delivery claim. Rather it seeks an injunction requiring Defendants "to provide timely notice to [HRDC] and other publishers of the [Publication Review Committee]'s decisions to censor *or* deliver their publications." We address this aspect of HRDC's motion for injunctive relief in our discussion of its Fourteenth Amendment notice claim.

### C. Fourteenth Amendment—Failure to Provide Notice

HRDC's last claim asserts that Defendants violated the Fourteenth Amendment by not providing notice of the Publication Review Committee's decision reversing the mailroom's censorship of *The Habeas Citebook*. The district court originally dismissed this claim, concluding there was no evidence that Defendants violated the Fourteenth

Amendment under *Procunier v. Martinez*, 416 U.S. 396, 418–19 (1974), *overruled on other grounds by*, *Thornburgh*, 490 U.S. 401. We reversed in *HRDC I* because the district court misread *Procunier*. 2023 WL 7211396, at *2. We explained that "the right to learn of the final decision of the decision-maker is included in the right to due process" and that "the Supreme Court's test is whether the due-process-based requirements are 'unduly burdensome' in the prison context." *Id.* (quoting *Procunier*, 416 U.S. at 419). We then vacated and remanded "for the district court to address if it would be 'unduly burdensome' to require *the Publication Review Committee* to notify HRDC of its final decision." *Id.* (emphasis added).

### 1. Qualified Immunity

HRDC argues that *Procunier* clearly establishes that publishers have a due-process right to notice of censorship decisions and that *HRDC I* held as much. We disagree. While we discussed *Procunier* in *HRDC I*, qualified immunity was not at issue. *See id*. Our prior decision cannot fairly be read as holding that *Procunier* clearly established that HRDC has a due-process right to be notified of the Publication Review Committee's decision regarding the permissibility of *The Habeas Citebook*. And considering this issue now, we conclude that *Procunier* does not clearly establish this right.

*Procunier* is a prisoner-mail-delivery case where the Supreme Court held that "the decision to censor or withhold delivery of a particular letter must be accompanied by minimum procedural safeguards." 416 U.S. at 417. The Court explained that "[t]he interest of prisoners and their correspondents in uncensored communication by letter, grounded as it is in the First Amendment, is plainly a

'liberty' interest within the meaning of the Fourteenth Amendment." *Id.* at 418. But the Court did not define the "minimum procedural safeguards" required in this context. Rather, it considered the safeguards that the district court had imposed in that case—"that an inmate be notified of the rejection of a letter written by or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence"—and determined that such procedural requirements were not "unduly burdensome." *Id.* at 418–19.

As we recognized in *HRDC I*, "the right to learn of the prison censors' final decision was not at issue in *Procunier*." 2023 WL 7211396, at *2. Nor did *Procunier* address the right to receive notice of a *favorable* decision reversing prior censorship, like the Publication Review Committee's decision here. And while we previously recognized that *Procunier* "did not purport to establish a complete list of what due process requires," *id.*, that it did not consider the specific notice right that HRDC asserts means that Defendants could have reasonably believed that it was constitutionally permissible not to notify HRDC of the Publication Review Committee's favorable decision. Thus, we affirm the district court's conclusion that qualified immunity bars monetary liability on this claim.

## 2. Injunctive Relief

As previously indicated, HRDC seeks a permanent injunction requiring Defendants to give publishers timely notice of the Publication Review Committee's decisions. Following our prior remand, the district court declined to address whether requiring *the Publication Review*

*Committee* to give publishers notice of its decisions would be unduly burdensome because neither DOC nor the Committee are parties to this action and, therefore, the court lacked jurisdiction over them. We agree that our prior direction on this issue was careless. The district court should have been instructed to consider whether it would be unduly burdensome to require *the officials named as Defendants* to provide publishers notice of Publication Review Committee decisions. But as this claim was asserted against Defendants in their official capacity, "the real party in interest . . . is the governmental entity and not the named official." *Hafer*, 502 U.S. at 25. Thus, the proper inquiry is whether it would be unduly burdensome for Coyote Ridge to provide notice of the Committee's decision.

*HRDC I* otherwise correctly articulated *Procunier*'s application to this case. *See* 2023 WL 7211396, at *2; *accord Krug v. Lutz*, 329 F.3d 692, 697–98 (9th Cir. 2003) ("[T]his circuit has repeatedly acknowledged that withholding delivery of inmate mail must be accompanied by the minimum procedural safeguards established in [*Procunier*]."). Thus, we again remand for the district court to analyze HRDC's motion for injunctive relief by assessing, among other things, whether HRDC is likely to prevail on the merits of its due-process claim under *Procunier* by showing that requiring Coyote Ridge to notify publishers of the Publication Review Committee's decisions would not be unduly burdensome.[3]

---

[3] Defendants argue that they did not violate due process because, quoting *Sorrels v. McKee*, they contend that "HRDC cannot show that this mistake was anything other than a 'random and unauthorized action.'" *See* 290 F.3d 965, 972–73 (9th Cir. 2002). The problem is that in *Sorrels*,

## CONCLUSION

The district court correctly held that qualified immunity bars monetary recovery on HRDC's first claim asserting that the challenged DOC policies violate the First Amendment and its third claim asserting a Fourteenth Amendment due-process violation for failure to provide HRDC notice of the Publication Review Committee's reversal of Coyote Ridge's censorship of *The Habeas Citebook*. But we reverse the district court's grant of qualified immunity as to HRDC's second claim challenging the delayed delivery of *The Habeas Citebook*. We also reverse the district court's denial of HRDC's motion for a permanent injunction. Therefore, remaining in this case are (1) HRDC's request for injunctive relief on its first and third claims, and (2) HRDC's request for both monetary and injunctive relief on its second claim.

**AFFIRMED in part, REVERSED in part, and REMANDED.**[4]

---

there was no evidence of "a widespread refusal or a custom or practice not to issue mail rejections," and, therefore, the evidence could only establish that the failure of notice was "a random mistake." *Id.* at 972. But here, there is evidence that Coyote Ridge has a common practice of not providing notice of the Publication Review Committee's decisions. Thus, *Sorrels* does not control.

[4] Each party shall bear its own costs.